UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 1, 2010__
```

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

OLGA BATYREVA,

                       Plaintiff,

           - against -

NEW YORK CITY DEPARTMENT
OF EDUCATION,

                    Defendants.

                07 Civ. 4544   (PAC) (DF)

                OPINION & ORDER

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HONORABLE PAUL A. CROTTY, United States District Judge:

      Pro se Plaintiff Olga Batyreva ("Batyreva") brings this action against her former

employer, Defendant New York City Department of Education ("DOE"), asserting claims under

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and the First

Amendment of the United States Constitution.  She alleges that Defendant terminated her

employment on the basis of her national origin (Russian), her age, and/or in retaliation against

her protected speech.  Batyreva seeks compensatory damages for "emotional distress, anguish,

anxiety, . . . and other psychological injury."  (Second Amended Complaint ("2d Am. Compl.") ¶

28.)

      In one form or another, the State Division of Human Rights ("SDHR"), the United States

Equal Employment Opportunity Commission ("EEOC"), an administrative arbitrator, and the

New York State courts, twice, have heard and rejected allegations based on the same underlying

facts at issue here.  Batyreva persists in her attempts to relitigate these claims before this Court,

as well.  After referring the general pretrial and dispositive motions in the case to Magistrate

Judge Debra C. Freeman, by Order dated September 18, 2008, this Court ruled that Batyreva is collaterally estopped from bringing any claims that arose before May 31, 2006—the date she brought her first action in state court.  The Defendants now bring a motion for summary judgment dismissing all other claims.  On August 23, 2010, Magistrate Judge Freeman issued a 55-page Report and Recommendation ("R&R"), advising the Court to grant DOE's motion for summary judgment in its entirety.  The Court has reviewed the R&R and Batyreva's 19 pages of objections timely filed on September 7, 2010.  For the reasons that follow, the Court adopts Magistrate Judge Freeman's findings and recommendations.  The motion for summary judgment is granted.

## BACKGROUND

### I. Facts[1]

Batyreva, a 72-year-old Russian immigrant, worked for DOE as a math teacher from 1999 until December 2006, when she was transferred out of the classroom and reassigned to the Manhattan Regional Operation Center, better known as the "Rubber Room," pending investigation of "serious" allegations made against her.  Batyreva received numerous negative evaluations and reviews from 2003 to 2006, and was ultimately terminated following a hearing in 2009.  In a number of actions ultimately decided against her, Batyreva has challenged these negative reports and her termination as motivated by discriminatory and/or retaliatory motives.

### A. Batyreva's Employment with the DOE

Batyreva was born in Russia in 1938, and moved to the United States in 1996.  In September 1999, Batyreva began working for DOE as a mathematics teacher at the Wings Academy in the Bronx, where DOE eventually granted her tenure.  In September 2003, Batyreva

---

[1] The facts are generally taken from the R&R and, where noted, from the parties' submissions.

was transferred to Murry Bergtraum High School ("MBHS"), a DOE school in Manhattan, where she continued to teach math.

Batyreva speaks English with a Russian accent.  Although Batyreva made minor grammatical mistakes in the classroom on a regular basis, there is some dispute about the degree to which Batyreva's students had difficulty understanding her spoken English. (See Pl. 56.1 Stmt. at ¶ 6d; Declaration of André L. Lindsay In Further Support of Defendant's Motion for Summary Judgment, sworn to Feb. 26, 2010, Ex. K; id. Ex. T; id. Ex. AA; id. Ex. JJ.)

On May 31, 2006, after receiving several unsatisfactory end-of-year ratings, Batyreva filed an Article 78 petition in the Supreme Court of the State of New York, New York County ("New York Supreme Court") seeking reversal of the ratings on the basis that they were motivated by discrimination because of her national origin.  (Declaration of Ivan A. Mendez, Jr., sworn to Nov. 2, 2007 ("Mendez Decl.") (annexed to Notice of Motion to Dismiss, dated Nov. 2, 2007), at Ex. B).  The court dismissed Batyreva's petition, and the Appellate Division affirmed. Batyreva v. New York City Dept. of Educ., 854 N.Y.S.2d 390 (1st Dep't 2008).  This action is the basis for the Court's September 18, 2008 Order, discussed below, collaterally estopping Batyreva from asserting Title VII claims which arose prior to May 31, 2006.

**B.  Batyreva's Actions That Allegedly Provoked Retaliation**

**1.  Batyreva's Letters about the Regents Examination**

In 2004, Batyreva and Yevgeniy Gilman, another math teacher at MBHS, jointly wrote to the Principal of MBHS, Barbara Esmilla, the DOE's Office of Special Investigation, and the DOE's Division of Assessment and Accountability ("DAA"), stating that MBHS teachers had violated the grading procedures for the January 2004 Regents Examination.  (Declaration of

André L. Lindsay, Esq., sworn to Dec. 11, 2009 ("Lindsay Decl."), Ex. DD, at 2, 3.)  Both the

DAA and the State Education Department informed Batyreva that no violation had occurred.

Batyreva alleges that, on July 1, 2005, she also addressed a similar complaint about the

Regents Examination to Special Commissioner Condon, who "renewed the case and transferred

it to the Chancellor's Office of Special Investigations."  (2d Am. Compl. ¶ 64.)  Batyreva states

that she has received no subsequent response from the Office of Special Investigations.  (Id.)

Finally, on December 10, 2006, Batyreva asserts that she wrote a letter to DOE Chancellor Joel

Klein proposing that the exams be graded by teachers from other schools.  (2d Am. Compl. ¶

32.)  Although Batyreva states that she sent copies of this 2006 letter to Mayor Michael

Bloomberg and Governor Eliot Spitzer, she does not claim to have sent the letter to anyone else.

(See id.)

### 2. Batyreva's State Division of Human Rights Complaint

In June 2004, Batyreva filed a complaint with the SDHR, alleging national origin

discrimination.  (See Lindsay Decl. Ex. GG ("SDHR Complaint").)  In her SDHR Complaint,

Batyreva alleged that Assistant Principal ("AP") Marion Tang discriminated against Batyreva

because of Batyreva's Russian national origin.  (See id. ¶¶ 3–5.)  AP Tang's allegedly

discriminatory conduct included, among other things, telling Batyreva to leave MBHS on

Batyreva's first day there, humiliating Batyreva in front of co-workers and students, and writing

false statements about Batyreva.  (See id. ¶ 4.)  Batyreva's SDHR Complaint did not make

allegations about any individuals other than AP Tang.  (See id. ¶¶ 2–5; Def. 56.1 Stmt. at ¶ 108.)

Furthermore, Batyreva did not assert an age discrimination claim in her SDHR Complaint.  (See

SDHR Complaint; Lindsay Decl. Ex. GG, ("SDHR Order").)

In an Order dated December 29, 2006, the SDHR concluded that no probable cause existed to believe that DOE had engaged in the unlawful discriminatory practices alleged in Batyreva's SDHR Complaint.  (See SDHR Order at 1.)  On January 4, 2007, Batyreva's attorney made an application to the EEOC for a review of the SDHR determination.  (Lindsay Decl. Ex. HH, at 2.)  On March 7, 2007, the EEOC adopted the findings of the SDHR and sent Batyreva a Right to Sue letter.  (Lindsay Decl. Ex. HH, at 1.)

### 3.  Batyreva's Efforts To Assist Joy Hochstadt

In June 2007, Batyreva submitted an affidavit in support of Hochstadt, a disabled DOE teacher, in a state-court proceeding about disciplinary actions taken by DOE against Hochstadt. A few months later, at an administrative hearing, Batyreva testified regarding purported "age and health discrimination" against Hochstadt. (See Def. Mem. at 14–15; 2d Am. Comp. ¶ 48.)

### C.  DOE's Alleged Adverse Actions Against Batyreva

Batyreva contends that, throughout her employment by DOE, she was subjected to a wide range of adverse employment actions that were discriminatory and/or retaliatory.  These actions consisted largely of negative performance evaluations and culminated in Defendant's termination of Batyreva in 2009.  They are summarized below.

### 1.  Actions Predating May 31, 2006

As noted above, this Court's September 18, 2008 Order barred Batyreva from asserting claims based upon conduct by DOE that predated May 31, 2006.  Although such conduct cannot give rise to actionable claims in this matter, the conduct may provide relevant background to the pending motion.

Prior to May 31, 2006, Batyreva was the subject of at least fourteen "Observation Reports" by her supervisors—thirteen "unsatisfactory" and one "satisfactory."  The stated

reasons for these unsatisfactory ratings included Batyreva's deficient lesson plans and lack of

classroom management skills.  Batyreva does not contend that she received any other satisfactory

ratings while at MBHS, although she has offered two letters complimenting her work, written in

2000 and 2002 by the Principal of Wings Academy.  (Plaintiff's Affirmation in Opposition to

Motion for Summary Judgment, sworn to January 15, 2010 ("Pl. Aff."), Exs. D1, D2.)  In

addition to these unsatisfactory observation ratings, Batyreva also received the following, all

before May 31, 2006: year-end unsatisfactory ratings for the 2003-2004 and 2004-2005

academic years (Pl. 56.1 Stmt. ¶ 35; Def. 56.1 Stmt. ¶ 55); two "counseling memoranda"

advising Batyreva about noise issues in her classroom and the students' improper access to

Batyreva's attendance logs (Def. 56.1 Stmt. ¶¶ 5–6, 61–63); and a letter concerning Batyreva's

purported failure to engage "every student" in her classes.  (Id. ¶¶ 59–60.)

### 2.  Julian's Observation Report

On May 12, 2006, Principal Esmilla asked Grace Julian, the former Principle of MBHS,

to conduct a classroom observation of Batyreva's fourth period class.  Julian rated the lesson

unsatisfactory.  (See Lindsay Decl. Ex. W.)  In her Observation Report, signed June 2, 2006,

Julian attributed the unsatisfactory rating to Batyreva's "poor classroom management skills,"

"poor lesson management skills," and "poor questioning skills," describing Batyreva's

deficiencies in each of those areas.  (Lindsay Decl. Ex. W, at 2-4).)  Batyreva acknowledged her

receipt of this report by a signature dated June 6, 2006.  (See id.)

### 3.  Batyreva's Year-End 2005-2006 Rating

On June 22, 2006, Batyreva received an overall unsatisfactory rating for the 2005-2006

school year.  Batyreva contends that this rating was inadequately based on only two observation

reports, while Batyreva's overall ratings for the 2003-2004 and 2004-2005 school years had been

based on seven and four observation reports, respectively.  (See id. Ex. X.)  Furthermore, one of these reports was authored by AP Steven Rubinstein, who was fired in March 2006 and is currently serving a 10-year sentence for pornography-related crimes.  (2d Am. Compl. ¶ 18; Answer ¶ 18.)

### 4.  Batyreva's Fall 2006 Class Schedule

For Fall 2006, Batyreva was assigned a daily class schedule of five periods of the same low-level "M$A" class, which is the first sequence in MBHS's mathematics courses.  According to Batyreva, she was assigned "the most problematic repeating M$A classes where all students repeated the course at least 2 times (but some of them up to 10 times)."  (Def. 56.1 Stmt. ¶ 75; Pl. 56.1 Stmt. ¶ 75.)  Batyreva's schedule allowed her to teach in the same classroom all day and, because all five of her classes were at the same level, DOE asserts that Batyreva had to prepare only one lesson plan per day.  (Def. 56.1 Stmt. ¶ 76.)  The record indicates that no other math teacher at MBHS was assigned more than one M$A class per day for the Fall 2006 semester.  (See 2d Am. Compl. ¶ 23; Lindsay Decl. Ex. Y (teacher schedules).)

### 5.  AP Vitolo's Disciplinary Letter

On December 5, 2006, after watching nine minutes of one of her previous classes, AP Jared Vitolo met with Batyreva to discuss his observations.  AP Vitolo subsequently issued a Disciplinary Letter stating that he had observed one student playing with the classroom phone, another using an electronic device, and another sifting through Batyreva's handbag, all while Batyreva taught a fourth student at the blackboard.  (Lindsay Decl. Ex. AA.)  AP Vitolo's letter also described Batyreva's failure to engage the entire class, poor classroom management, and improper use of English.  (Lindsay Decl. Ex. AA, at 2.)  In a response dated January 3, 2007, Batyreva objected to the Disciplinary Letter, claiming that it contained false allegations and

statements.  (Lindsay Decl. Ex. AA, at PERS 0003-0006.)  Batyreva also asserted that the letter's

real purpose was to establish a case for her dismissal, in retaliation for her complaints about the

January 2004 Regents Examination.  (Id. at PERS 0004, 0005.)  Batyreva further stated that AP

Vitolo's criticism of her English was discriminatory because mistakes in her oral speech were

"not connected with math content and didn't interfere with students' understanding" and

American-born teachers made mistakes in their use of English – some of which had resulted in

students' misunderstanding—and those teachers were not criticized for their improper English.

(Lindsay Decl. Ex. AA, at PERS 0005-0006.)  As an example, Batyreva pointed out that AP

Tang's curriculum outline contained the grammatically incorrect phrase "Addition and Simplify"

but nevertheless the outline had been used at MBHS since 2002, without any correction or

criticism.  (Id. at PERS 0006.)

### 6. Superintendent Gorman's Letter

On December 19, 2006, Local Instructional Superintendent Elaine Gorman visited

Batyreva's fifth period class.  (See Lindsay Decl. Ex. BB ("Gorman Letter").)  In a letter, dated

December 20, 2006, addressed to Batyreva, and copied to Principal Esmilla, Superintendent

Gorman detailed Batyreva's lesson and found her delivery of instruction to be "unacceptable."

(Gorman Letter at 2.)  Superintendent Gorman noted that, among other things, Batyreva did not

address students' talking and sharing answers during a quiz, failed to reprimand a student for

listening to loud music through headphones, and demeaned a student by "loudly indicating that

the work was [second] grade."  (Gorman Letter at 1-2.)  Although Superintendent Gorman

affirmed Batyreva's knowledge of mathematics, she concluded that Batyreva's delivery of

instruction, demeaning comments to students, and failure to comply with regulations were

"unacceptable" and "unprofessional."  (Gorman Letter at 2.)

By letter dated June 20, 2007, Batyreva responded to Superintendent Gorman's letter, admitting the allegations; but explaining her behavior.  (Pl. 2d Aff. Ex. Q.)  Batyreva did not deny that she had described one of her students' mistakes as "second grade," (id. at 1,) and said that many students had been late that day because gym class and a concert had preceded her class.  (Id. at 1.)  She did not dispute that students had talked during the lesson, but contended that she had permitted the students to discuss the problems in this manner because they were not taking an "official test" at the time.  (Id. at 3.)  Finally, Batyreva disagreed with Superintendent Gorman's conclusion that her instructional practices were "unproductive or unacceptable," and questioned how this could be a valid criticism in a country where math instruction is overwhelmingly unsuccessful as a whole.  (Id. at 2.)  According to Batyreva, her students' scores were higher than those of students in other comparable classes.  (Id. at 2.)  Batyreva further claimed that, insofar as she departed from expected educational practices, she was justified in doing so because these methods were particularly unsuccessful with the low-performing students assigned to Batyreva's classes.  (Id. at 2–3.)  According to Batyreva, Superintendent Gorman's recommendations were "very good for teaching Humanities, but not for Math."  (Id. at 3.)

### 7.  Batyreva's Reassignment to the Manhattan Regional Operation Center

By letter dated December 19, 2006, the same date as Superintendent Gorman's visit, DOE informed Batyreva that "a serious allegation" had been made against her and, pending an investigation, reassigned her to the Manhattan Regional Operation Center, better known as the Rubber Room. (Lindsay Decl. Ex. CC.)  DOE contends that the reassignment was ordered "pending an investigation into the allegations in . . . Superintendent[ Gorman]'s letter and pending the service of disciplinary charges." (Def. 56.1 Stmt. ¶ 89.)  Batyreva did not teach any classes while assigned to the Rubber Room.

### 8. Batyreva's Termination

On February 5, 2007, Batyreva was served with thirteen disciplinary "specifications"[2] that spanned the school years of 2003-2004, 2004-2005, 2005-2006, and 2006-2007.  To address these charges, Arbitrator Jack D. Tillem ("Arbitrator") held a hearing pursuant to New York Education Law § 3020-a over the course of nine days between January and September, 2009. (Section 3020-a Opinion at 1.)  Batyreva was represented by her union attorney at the hearing. The DOE presented four witnesses at the hearing: Principal Esmilla, AP Vitolo, AP Tang, and Julian.  (See id. at 5, 8, 24, 26.)  Batyreva presented two witnesses in her defense: a student who had been in her class and a former math teacher from MBHS.  (Section 3020-a Opinion at 31; Def. 56.1 Stmt. ¶ 102.)  During the hearing, Batyreva argued that DOE's conduct was discriminatory and retaliatory.  Batyreva maintained that her negative evaluations "ha[d] nothing to do with her teaching," but rather were issued against her (1) "because she is Russian," (2) "because she complained to the [State] Division of Human Rights about her treatment at the school," and (3) "because she filed a complaint with the [Office of Special Investigation] about alleged Regents misconduct at the school."  (Section 3020-a Opinion at 29–30.)

DOE withdrew one of the thirteen specifications prior to the administrative adjudication and failed to introduce any evidence to substantiate another.  (Linsday Decl. Ex. FF ("Section 3020-a Opinion"), at 17, 22.)  The Arbitrator ultimately found three other specifications to be unsubstantiated because the employees who wrote the relevant evaluations and letters—AP Rubinstein and Superintendent's Representative Patrick Burke—failed to appear at the hearing. (See id. at 10-11, 21–22, 23.)  Of the remaining eight specifications, six stemmed from unsatisfactory Observation Reports issued between March 2004 and October 2005. (See id. at 2–

---

[2] A "specification" describes a specific instance of unsatisfactory teaching performance that may, either alone or in conjunction with other specifications, provide a basis for DOE to terminate an employee.

23.)  Only two of the specifications arose from evaluations or reviews after May 31, 2006—(1) Julian's unsatisfactory Observation Report, signed June 2, 2006, and (2) AP Vitolo's disciplinary letter, dated December 5, 2006.  (See id. at 23, 26; Lindsay Decl. Exs. W, AA.)

On November 30, 2009, in the course of the instant action, the Arbitrator issued an award sustaining the eight specifications noted above, dismissing the remaining specifications, and discharging Batyreva.  (See Section 3020-a Opinion at 33.)  The Arbitrator found that "the evaluation[s], observations, and performance reviews [of Batyreva's teaching] were fair, objective, and professional."  (Id. at 23-28, 32 (sustaining Specifications Nos. 12 and 13).)  The Arbitrator determined that the DOE had "sustained its burden of proving by a preponderance of the evidence that [Batyreva] is incompetent, that she is unable to further the educational development of students assigned to her classroom, that she rejects any attempt to help her improve[,] and that there is no likelihood that she can be rehabilitated."  (Id.)  The Arbitrator rejected Batyreva's contention that "all the negative evaluations [against her] [were] pretextual and thus invalid."  (Id. at 25.)

 In issuing his findings, the Arbitrator noted that Batyreva's conduct during the hearing demonstrated her difficulty in taking advice or following directions.  (Id. at 30.)  In particular, the Arbitrator found that Batyreva consistently resisted her attorney's advice and the Arbitrator's efforts to keep her focused on the relevant issues.  (Id. at 30–31.)  Based on his findings,

On January 10, 2010, Batyreva filed an Article 75 petition in New York Supreme Court to vacate the Arbitrator's award against her. (Lindsay Decl. at Ex. LL.)  On June 9, 2010, the Supreme Court denied and dismissed the petition in its entirety. (Letter from A. Lindsay to the Court, dated June 16, 2010, at Ex. A.)

**D. Procedural History of the Instant Action**

Batyreva initiated the current action in this Court pro se on May 30, 2007.  She used the employment discrimination "form" complaint available from this Court's <u>Pro Se</u> Office, which indicated that she was pursuing Title VII discrimination claims, as well as an Attachment setting forth particular factual allegations of retaliation.  On June 5, 2007, the Court referred general pretrial and dispositive motions in the case to Magistrate Judge Debra C. Freeman.  On November 2, 2007, the DOE moved to dismiss the Complaint in its entirety on the grounds of collateral estoppel, and, alternatively, failure to state a Title VII claim.

On August 12, 2008, Magistrate Judge Freeman issued an R&R advising the Court to grant the DOE's motion in part and deny it in part.  Magistrate Judge Freeman recommended dismissing Batyreva's Title VII claims of discrimination and retaliation occurring before May 31, 2006 on the ground that they were collaterally estopped by the dismissal of the Article 78 petition in state court.  Magistrate Judge Freeman further recommended dismissing the Title VII retaliation claims stemming from her complaints about Regents Examination misconduct, because Title VII does not protect such activity.  Finally, Magistrate Judge Freeman recommended denying DOE's motion to dismiss claims occurring after May 31, 2006.  Neither party filed an objection to the R&R.  On September 18, 2008, this Court adopted the R&R in full and referred the remaining claims to Magistrate Judge Freeman for general pretrial and dispositive motions.  On December 11, 2009, DOE moved for summary judgment dismissing the claims of Title VII discrimination and retaliation, age discrimination, and First Amendment retaliation asserted in Batyreva's Second Amended Complaint.

On August 23, 2010, Magistrate Judge Freeman issued her thorough review and analysis

in a 55-page R&R, recommending that the Court grant DOE's motion for summary judgment in

its entirety.  Magistrate Judge Freeman concluded that:

> (1) the District Court does not have jurisdiction over the ADEA claim;
> (2) this Court's September 18, 2008 decision applies by the same reasoning to bar any First Amendment claims arising before May 31, 2006;
> (3) collateral estoppal bars the relitigation of any claims challenging her termination, as the underlying factual issues were fully litigated and decided in her termination hearing, affirmed by New York State Supreme Court;
> (4) Batyreva has failed to establish prima facie Title VII discrimination and retaliation claims based on actions after May 31, 2006;
> (5) Batyreva has failed to produce evidence of a causal connection to support a First Amendment retaliation claim based on adverse action taken against her after May 31, 2006.

Batyreva filed timely objections on September 8, 2010.

### E. Disputed and Undisputed Facts that, According to Batyreva, Give Rise to an Inference of Discrimination

Batyreva contends that, prior to his departure from MBHS in March 2005, AP Tang

discriminated against her based on her Russian nationality by, among other things, telling her to

leave MBHS on her first day there, humiliating her in front of co-workers and students, and

writing false statements about her.  (Pl. 56.1 Stmt. ¶¶ 6(a)-(l); see also 2d Am. Compl. ¶¶ 5-6.)

Batyreva asserts that AP Tang once stated, "Ms. Batyreva should speak slowly and clearly," to

the laughter of students.  (Pl. 56.1 Stmt. ¶¶ 106(i), 6(d).)  As noted above, Batyreva presented

many of these allegations about AP Tang to the SDHR, and the SDHR found no probable cause

to believe that Batyreva had been discriminated against in the manner alleged. (See Section B(2),

supra.)  Batyreva contends that Gilman, another Russian teacher, was also given unsatisfactory

ratings by MBHS administration until his English improved and he agreed to stop pursuing

complaints regarding improper scoring of the Regents Examination. (See Pl. 56.1 Stmt. ¶¶ 6(a)-(l).)

Batyreva further alleges that various other supervisors discriminated against her by criticizing her spoken English. (Pl. 56.1 Stmt. ¶ 106(i).)  Four different evaluators mentioned mistakes in Batyreva's oral speech in their evaluations, including AP Vitolo in his December 2006 evaluation.  (Lindsay Decl. Exs. K, M, T, AA.)  The disciplinary charge leading to Batyreva's termination mentioned her grammatical errors seven times.  Batyreva argues that mistakes in her speech were an improper ground for adverse action because they did not impede her students' learning or comprehension.  (See, e.g., 2d Am. Compl. ¶ 71.)  AP Tang testified, however, that students and parents complained that they had trouble understanding Batyreva. (See Lindsay Decl. Ex. JJ, at 245.)  In Batyreva's response to the Disciplinary Letter written by AP Vitolo, Batyreva stated that his criticism of her English was discriminatory because American-born teachers were not criticized for their improper use of English.  (Lindsay Decl. Ex. AA.)

Batyreva also contends that Defendants treated her differently from her peers with respect to other evaluation criteria.  For example, according to Batyreva, student absenteeism was an issue for all teachers in MBHS, but Batyreva was the only teacher who received an unsatisfactory rating based on student attendance issues. (Pl. 56.1 Stmt. ¶¶ 43-44.)  One of her colleagues' classes were attended, respectively, by 65.5%, 80%, 48.4%, and 60% of the enrolled students, while AP Tang's January 10, 2005 observation report noted that only 40.7% of the students attended Batyreva's class that day.  (See Pl. Aff., Ex. O2; Lindsay Decl. Ex. P, at 2.)

**II. Governing Law and Magistrate Judge Freeman's R&R**

Since Batyreva is proceeding in this action pro se, Magistrate Judge Freeman construed her papers liberally and interpreted them to "raise the strongest arguments that they suggest." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks and citation omitted).  Batyreva asserts four claims: (1) age discrimination under the ADEA; (2) discrimination based on national origin under Title VII; (3) retaliation in response to her protected activity under Title VII; and (4) retaliation in response to her protected speech under the First Amendment.  (R&R, Aug. 23, 2010, at 25–26.)  Magistrate Judge Freeman ultimately recommended granting summary judgment on all four.

**A. ADEA Claim**

Magistrate Judge Freeman first concluded that the Court should dismiss Batyreva's age discrimination for lack of jurisdiction over the claim.  (R&R, Aug. 23, 2010, at 26.)  A district court has jurisdiction over an ADEA claim only if that claim was either "included in an EEOC charge" or "based on conduct subsequent to the EEOC charge which [was] 'reasonably related' to that alleged in the EEOC charge."  Butts v. City of New York Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993), superseded by statute on other grounds as recognized in Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684 (2d Cir. 1998); see also Ximines v. George Wingate High Sch., 516 F.3d 156, 158 (2d Cir. 2008); Miller v. Int'l Tel. & Telegraph Corp., 755 F.2d 20, 23 (2d Cir. 1985).  Magistrate Judge Freeman noted that neither of these grounds is present here.  (R&R, Aug. 23, 2010, at 26.)

Magistrate Judge Freeman first determined that Batyreva did not include an age discrimination claim in any EEOC charge, failing the first prong of the jurisdictional requirement. (Id.)  Batyreva argues that it is not necessary to present age discrimination claims to

the EEOC before litigating them in federal court—an argument that Magistrate Judge Freeman attributed to a misreading of the Court's manual for <u>pro se</u> litigants.[3]  Therefore, Magistrate Judge Freeman concluded, since Batyreva does not dispute that she failed to bring any age discrimination claims before the EEOC, she has failed the first prong of the jurisdictional test. (<u>Id.</u> at 27.)

Magistrate Judge Freeman also determined that Batyreva's age discrimination claim is not "reasonably related" to her EEOC charges, which allege only national origin discrimination. (<u>Id.</u>)  Magistrate Judge Freeman concluded that, because age discrimination is a "wholly different type of discrimination" than national origin discrimination, the age discrimination claim is not reasonably related to her EEOC charges.  (<u>Id.</u>)

### B. Claims Barred due to Collateral Estoppel

"The 'fundamental notion' of the doctrine of collateral estoppel, or issue preclusion, 'is that an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the same parties or their privies." <u>Ali v. Mukasey</u>, 529 F.3d 478, 489 (2d Cir. 2008) (quoting <u>United States v. Alcan Aluminum Corp.</u>, 990 F.2d 711, 718–19 (2d Cir. 1993)).  Collateral estoppel applies when:  "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was 'actually litigated and actually decided,' (3) there was a 'full and fair opportunity for litigation in the prior proceeding,' and (4) the issues previously litigated were 'necessary to support a valid and final judgment on the merits.'" <u>Ali</u>, 529 F.3d at 489 (quoting <u>Gelb v. Royal Globe Ins. Co.</u>, 798 F.2d 38, 44 (2d Cir. 1986)).

---

[3] The manual states that the ADEA and other federal employment discrimination statutes "require a party first to pursue his/her administrative remedies with the [EEOC] and (except for age discrimination claims) obtain a notice of right to sue letter before filing this type of claim in federal court."  This means that both the ADEA and Title VII require a plaintiff to exhaust his claim by bringing it before the EEOC, but the ADEA—unlike Title VII—does not require a plaintiff to acquire a 'right-to-sue' letter before bringing the federal action.  (R&R at 26.)

### 1. First Amendment Claims Arising Prior to May 31, 2006

The Court's September 18, 2008 decision already barred Batyreva from relitigating the Title VII discrimination and retaliation claims raised in her Article 78 proceeding, filed on May 31, 2006.  (R&R, Aug. 23, 2010, at 28.)  Magistrate Judge Freeman concluded that, based on the same reasoning, Batyreva should also be estopped from relitigating any First Amendment claims based on adverse actions arising before May 31, 2006. (Id.)  In disposing of the Title VII retaliation claims, the state court necessarily addressed the same factual issues underlying this First Amendments retaliation claim—that is, the DOE's adverse actions allegedly in response to Batyreva's complaints about the Regents Examination.  (Id. at 29–30.)  Accordingly, Magistrate Judge Freeman recommended dismissing the First Amendment retaliation claims pleaded in Batyreva's Second Amended Complaint, insofar as they are based on events that occurred before May 31, 2006. (Id. at 30.)

### 2. Claims Based on Batyreva's Termination

Magistrate Judge Freeman further reasoned that the Court should bar Batyreva from relitigating any claims challenging her termination, as the underlying factual issues were fully litigated at and decided by her hearing and the state court's dismissal of her Article 75 petition.  (Id. at 28)  The "Second Circuit has held, and the parties do not dispute, that Section 3020-a hearings are administrative adjudications that have preclusive effect."  Burkybile v. Bd. of Educ. of the Hastings-on-Hudson Union Free Dist., 411 F.3d 306, 310–12 (2d Cir. 2005).  Magistrate Judge Freeman found that the Arbitrator addressed four of the seven adverse actions allegedly taken against her after May 31, 2006 in his decision.  (R&R, Aug. 23, 2010, at 31.)  Magistrate Judge Freeman concluded that collateral estoppel also bars any claims challenging those four post-May 31, 2006 adverse actions.  (R&R, Aug. 23, 2010, at 32.)

Specifically, Magistrate Judge Freeman found that Batyreva had a full and fair opportunity to litigate the pertinent four issues during the arbitration hearings and that the resolution of these issues was necessary for the final judgment. (Id.)  The hearing spanned nine days and Batyreva was able to call witnesses, introduce evidence, and make arguments. Magistrate Judge Freeman also found the Arbitrator's conclusion that the evaluations were "fair, objective, and professional" necessarily required him to consider and reject Batyreva's allegations of discrimination and retaliation.  (Id.)

Notably, Magistrate Judge Freeman addressed Batyreva's argument—one raised again in her objections to the R&R—that the proceedings were not fair because she was not permitted to introduce her students' tests scores as evidence of their academic performance. (Id.; Plaintiff's Objections to Report and Recommendation of Magistrate Judge Freeman, Sept. 7, 2010 ("Obj."), at 9.)  Magistrate Judge Freeman determined that the pertinent issues decided in the hearing and now before this Court—i.e., whether Batyreva's negative evaluations were the product of discriminatory and/or retaliatory motives—could have been fully and fairly adjudicated by the Arbitrator without considering the test scores.  (R&R, Aug. 23, 2010, at 32.)

Therefore, Magistrate Judge Freeman recommended barring claims based on these four actions.  Magistrate Judge Freeman additionally recommended that the Court not permit Batyreva to relitigate the claim that her 3020-a hearing was jurisdictionally deficient or violated due process, as the Article 75 court explicitly considered and rejected such arguments. (Id.)

### C.  Batyreva's Remaining Title VII Discrimination Claims

Magistrate Judge Freeman determined that this Court can only review claims based on the three allegedly adverse actions that postdate May 31, 2006 and were not challenged in the 3020-a hearing: (1) Batyreva's allegedly unfavorable class schedule for Fall 2006; (2)

Superintendent Gorman's December 20, 2006 letter; and (3) Batyreva's assignment to the Rubber Room on December 19, 2006. (R&R, Aug. 23, 2010, at 34.)

In the absence of direct evidence, Batyreva's Title VII discrimination claims are governed by the three-step burden shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). First, the plaintiff must establish a prima facie case of discrimination by showing that (1) she was a member of the protected class; (2) she was qualified for the job in question; (3) the employer took an adverse employment action against her; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. See Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000) (discussing Title VII framework in the context of an ADEA claim). The burden of proof that a plaintiff must meet to survive a motion for summary judgment at the prima facie stage is de minimis. "In determining whether the plaintiff has met the de minimis initial burden…, the function of the court on a summary judgment motion is to determine whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 204 (2d Cir. 1995) (internal quotation marks and citation omitted); see Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 94 (2d Cir. 2001).

If the plaintiff makes this de minimis showing, then an inference of discrimination is created, and the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse action taken against the plaintiff. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142–43 (2000); see also Schnabel, 232 F.3d at 87. The employer need not persuade the Court that the proffered reason was the actual reason for the adverse action; rather, the employer's burden is simply to rebut the plaintiff's prima facie case by

producing admissible evidence that clearly sets forth the reasons for the adverse action against the plaintiff.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254–55 (1981).  If the employer articulates such a reason, the presumption of discrimination disappears, see St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993), and the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the defendant's proffered reason was a pretext for discrimination.  See Reeves, 530 U.S. at 143.  The ultimate burden of proving that the defendant intentionally discriminated or retaliated remains at all times with the plaintiff. Burdine, 450 U.S. at 253.  Due to the highly fact-specific nature of the inquiry, an extra measure of caution is needed in awarding summary judgment to a defendant where, as in a discrimination or retaliation case, intent is at issue.  Gallo v. Prudential Residential Servs. LP, 22 F.3d 1219, 1224 (2d Cir. 1994).

Magistrate Judge Freeman concluded that Batyreva failed to establish a prima facie claim of national origin discrimination under Title VII.  (R&R, Aug. 23, 2010, at 36.)  Magistrate Judge Freeman concluded that none of the three remaining alleged adverse actions satisfies Batyreva's de minimis burden.  Specifically, (1) Batyreva's purportedly unfavorable teaching schedule for the Fall 2006 semester is not an "adverse employment action," (id. at 37-38 (determining that this new schedule did not "significantly diminish [her] material responsibilities, . . . or otherwise ha[ve] such a substantial impact on her job as to be considered tantamount to a demotion)); (2) Batyreva has not shown that Superintendent Gorman's Letter, though possibly an adverse employment action, issued under circumstances that give rise to an inference of discrimination (id. at 39–41 (determining that, ultimately, Batyreva does not dispute the factual allegations contained in the letter, and, therefore, that there is no evidence to suggest that the letter was written for any reason other than to report what Superintendent Gorman

20

actually saw in Batyreva's classroom)); and (3) Batyreva has not shown that her assignment to the Rubber Room—plainly an adverse employment action—occurred under circumstances giving rise to an inference of discrimination.  (Id. at 41–44 (determining that, since the assignment was indisputably based on Superintendent Gorman's letter, the R&R's preceding analysis of that letter "essentially disposes of any argument that a reasonable juror could infer a discriminatory motive for the reassignment").)

### D.  Batyreva's Remaining Title VII Retaliation Claim

Similarly, to establish a prima facie case of retaliation under Title VII, a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find that: (1) the plaintiff engaged in protected participation or opposition under Title VII; (2) the employer was aware of this activity; (3) the employer took adverse action against the plaintiff;[4] and (4) "a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action."  Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 205–06 (2d Cir. 2006).  Magistrate Judge Freeman determined that Batyreva failed to establish a prima facie Title VII retaliation claim because she did not produce sufficient evidence of a causal connection between her protected activity and the DOE's adverse actions. (R&R, Aug. 23, 2010, at 44.)

Plaintiff engaged in protected activity when she pursued a complaint of national origin discrimination with the SDHR and EEOC and when she helped a disabled DOE teacher (Hochstadt) challenge disciplinary allegations.  (See Def. Mem. at 14.)  As a matter of law, however, much of this protected activity cannot support a prima facie case because it postdates

---

[4] The "adverse action" element of a retaliation claim is broader than the "adverse employment action" element of a Title VII discrimination claim.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68 (2006).  In the retaliation context, an "adverse action" is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id. at 68 (internal quotations omitted); see also Kaytor v. Elec. Boat Corp., 609 F.3d 537, 550-51 (2d Cir. 2010).

Defendant's alleged misconduct.  As already noted, because of collateral estoppel, the only

conduct at issue is, (1) Plaintiff's Fall 2006 schedule, (2) Superintendent Gorman's December

20, 2006 letter, and (3) Plaintiff's reassignment to the Rubber Room on December 19, 2006.  The

last instance of Defendant's allegedly retaliatory conduct at issue here occurred on December 20,

2006.  Yet, except for Plaintiff's initial filing of her SDHR complaint in June 2004, each instance

of protected activity by Plaintiff occurred after December 20, 2006: the SDHR issued its decision

on December 29, 2006; Plaintiff appealed that decision to the EEOC on January 4, 2007; and

Plaintiff did not become involved in Hochstadt's case until 2007.  (See SDHR Complaint; SDHR

Order; Def. 56.1 Stmt. ¶¶ 107, 110, 112; Def. Mem. at 14-15; 2d Am. Compl. ¶¶ 47, 48.)

Magistrate Judge Freeman concluded that Defendant could not have taken these actions in

response to Plaintiff's protected activity.

       Plaintiff's filing of her SDHR complaint is the only particular instance of protected

activity that predates Defendant's challenged conduct.  Magistrate Judge Freeman determined,

however, that Plaintiff has offered no evidence that would permit a reasonable juror to infer a

causal connection between this action and any allegedly retaliatory response.  Specifically, the

relevant alleged misconduct occurred at least two years after the June 2004 SDHR filing.  As in a

discrimination claim, adverse action that occurs long after the protected activity does not give

rise to a reasonable inference of retaliation.  See, e.g., Mandell v. Cnty. of Suffolk, 316 F.3d 368,

384 (2d Cir. 2003) ("It makes logical sense that if an employer wishes to retaliate by firing an

employee, he is likely to do so soon after the event."); Hollander v. Am. Cynamid Co., 895 F.2d

80, 86 (2d Cir. 1990) (affirming dismissal of retaliation claim because there was no causal

connection between plaintiff's protected activity and the adverse action taken against plaintiff

less than four months later); Cody v. Cnty. of Nassau, 577 F. Supp. 2d 623, 645 (E.D.N.Y. 2008)

(dismissing retaliation claim because a thirteen-month gap made an inference of causation too

attenuated); <u>Johnson v. N.Y. Presbyterian Hosp.</u>, 00 Civ. 6776 (LAP), 2001 U.S. Dist. LEXIS

10369, at *17 (S.D.N.Y. July 20, 2001) (holding that a two-year gap is insufficient to infer

causation).

 Magistrate Judge Freeman further reasoned that there was no evidence either that

Batyreva received negative comments concerning her filing of the SDHR complaint or of any

other direct connection between this protected activity and the adverse actions.  Because Plaintiff

has failed to establish a <u>prima facie</u> Title VII retaliation claim, Magistrate Judge Freeman

recommended granting summary judgment dismissing this claim.

 **E. Batyreva's Remaining First Amendment Claim[5]**

 Magistrate Judge Freeman also recommends dismissing Plaintiff's First Amendment

retaliation claim on the merits.  To succeed on such a claim, a plaintiff must produce evidence

"(1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action[6]

against the plaintiff; and (3) that there was a causal connection between the protected speech and

the adverse action."  <u>Morales v. Mackalm</u>, 278 F.3d 126, 131 (2d Cir. 2002) (overruled on

unrelated grounds).  Defendant may still avoid liability by demonstrating that he or she would

have taken the same adverse action "even in the absence of the protected conduct."  <u>Graham v.</u>

---

[5] Magistrate Judge Freeman first notes that, although Plaintiff asserted a First Amendment claim in her Second Amended Complaint, she appears to have withdrawn this claim.  (<u>See</u> Pl. Mem. at 3 ("[I]n this action I don't ask [for] protection under [the] First Amendment.")  Yet, despite her assertions that she is not pursuing such a claim, she asks the Court to allow a jury to decide "a triable issue of material fact regarding [her] First Amendment claims." (Pl. Mem. at 3, 10.)  This purportedly "triable issue" is whether MBHS actually violated state rules and regulations when administering and scoring the Regents Examination in 2004.  (<u>See id.</u> at 3, 10-11.)  Plaintiff claims that resolution of this fact is relevant to her other claims insofar as it speaks to the credibility of her evaluators.  (<u>Id.</u> at 3.)  Out of an abundance of caution, and in light of Plaintiff's <u>pro se</u> status, the Court will consider the merits of the First Amendment claim that she has pleaded.
[6] In the context of a First Amendment retaliation claim, an adverse action is "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights."  <u>Dawes v. Walker</u>, 239 F.3d 489, 493 (2d Cir. 2001) (overruled on unrelated grounds).

Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (quoting Mt. Healthy City Sch. Dist. v. Doyle, 429 U.S. 274, 287 (1977)).

Plaintiff's bases her claim on the "whistle-blower" complaints she made about the scoring of the Regents Examinations at MBHS.  Specifically, during the first half of 2004, she sent letters to Principal Esmilla, the DOE's Office of Special Investigation, the DOE's DAA, and the Board of Regents, complaining that MBHS had violated state rules and regulations.  Plaintiff also alleges that she submitted a complaint to the Special Commission of Investigation in July 2005 and wrote a letter to DOE Chancellor Joel Klein on December 10, 2006.  For purposes of this motion, Defendants concede that the 2004 and 2005 communications constitute protected speech.

As noted above, the only conduct at issue is the assignment of Plaintiff's Fall 2006 class schedule; Superintendent Gorman's December 20, 2006 letter; and Plaintiff's December 19, 2006 reassignment to the Rubber Room.  Magistrate Judge Freeman recommended dismissing this claim for the following reasons:  Since the assignment of the class schedule occurred more than a year after the whistle-blowing communications, there is no evidence of a causal connection;  that is, the requisite temporal proximity is lacking.  As Plaintiff has offered no evidence to refute the accuracy of the information contained in Superintendent Gorman's letter, or to suggest that there was an improper, retaliatory motive, the record indicates that it would have been written "even in the absence of [Batyreva's] protected conduct."  Graham, 89 F.3d at 79.  Although Plaintiff argues that Defendant reassigned her to the Rubber Room to prevent her from telling a state commission about MBHS's alleged grading violations,[7] the only evidence she has to support this allegation is the temporal proximity of these events.  Magistrate Judge

---

[7] Plaintiff alleges that in early 2007, a commission from the New York State Department of Education was expected to visit MBHS during a process of restructuring pursuant to the "No Child Left Behind" Act.  (2d Am. Compl. ¶ 29.)

Freeman concluded that there was no evidence in the record that a visit from a state commission was actually imminent, that Batyreva would have had direct access to any visiting commissioner, or that anyone at MBHS had expressed concern over her bringing this information to the attention of the commission.  Magistrate Judge Freeman further noted that, even if the school did wish to prevent Batyreva from contacting this commission, this desire is as likely to have been motivated by the superintendent's determination that her teaching performance was "unacceptable."  (R&R, Aug. 23, 2010, at 52.)

Finally, regarding the December 10, 2006 letter to Joel Klein, Magistrate Judge Freeman noted that Plaintiff has failed to submit to the Court either a copy of this letter or any evidence that Defendants were aware of it when they decided to reassign her.  (R&R, Aug. 23, 2010, at 53.)  Even if Defendants were aware of this letter, because it merely repeated her earlier complaints, the temporal proximity alone is incapable of making the reassignment decision suspicious.  See Menes v. City Univ. of N.Y. Hunter Coll., 578 F. Supp. 2d 598, 616 (S.D.N.Y. 2008).  Moreover, Magistrate Judge Freeman reasoned that the Arbitrator's preclusive findings about the deficiencies in Plaintiff's classroom performance demonstrate that there was a legitimate, non-retaliatory reason for her termination and, by extension, her reassignment to the Rubber Room.  (See Section 3020-a Opinion, at 32 (holding that the negative "evaluation[s], observations, and performance reviews were fair, objective, and professional").)

## DISCUSSION

### I. Standard of Review

A district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).  When a party has timely objection to the recommendations of the magistrate judge, the court is obligated to review

the contested issues <u>de novo</u>.  <u>Hynes v. Squillace</u>, 143 F.3d 653, 656 (2d Cir. 1998).  The Court,

however, "may adopt those portions of the Report [and Recommendation] to which no objections

have been made and which are not facially erroneous."  <u>La Torres v. Walker</u>, 216 F. Supp. 2d

157, 159 (S.D.N.Y. 2000).

## II. Batyreva's Objections

Batyreva's objections do not add anything to what has been said before.  Mainly the

objections reiterate the facts and assertions raised in her various papers to the Court.  She fails to

raise any new disputed facts or evidence that weigh against the granting of summary judgment.

Batyreva claims that there exist disputed facts about the circumstances of several of the

alleged adverse actions taken by the DOE against her.  The Court must summarily dismiss many

of these claims due to the doctrine of collateral estoppel, as Magistrate Judge Freeman

recommended.  Batyreva's objections to the facts and circumstances of any events underlying

either her Article 78 petition, or her termination and subsequent Article 75 petition, have been

reviewed and necessarily decided against her, and thus, cannot be relitigated in this Court.

Therefore, the only adverse actions on which Batyreva may base a claim are the following:  (1)

the alleged unfavorable Fall 2006 schedule of lower-level classes; (2) Superintendent Gorman's

letter; and (3) Batyreva's reassignment to the Rubber Room.

Batyreva again raises the fact that the degree to which her students had difficultly

understanding her English is a disputed fact that should go to a jury.  (Obj. at 1–3.)  Batyreva

provides no evidence, however, that her spoken English was a deciding factor in any of the three

adverse actions that this Court can review.  As Magistrate Judge Freeman observed,

Superintendent Gorman's letter did not even mention Batyreva's English.  (R&R, Aug. 23, 2010,

at 40.)  Prior proceedings have addressed all other allegedly discriminatory evaluations and

found them to be fair and reasonable assessments.  Accordingly, this Court will not reconsider them.

Furthermore, any other objections to the various negative observation reports by Batyreva's supervisors are also barred from review by this Court.  Batyreva argues, <u>inter alia</u>, that her classroom and teaching skills were never compared to those of other teachers, (obj. at 8,) that her classroom did not have any more fights or incidents of bad behavior than other classrooms (<u>Id.</u> at 9), that her due process rights were violated because, unlike other teachers, she was not provided post-observations as an opportunity to cancel her negative evaluations.  (<u>Id.</u> at 8.).  Because this Court cannot review any of these allegedly discriminatory and unfair observations, except for Superintendent Gorman's letter, Batyreva's objections regarding the bases of these reports are irrelevant.

This Court also may not reconsider the findings or fairness of Batyreva's 3020-a hearing.  (<u>Id.</u> at 13, 15–16.)  The Article 75 court reviewed and necessarily decided that Batyreva received a fair 3020-a hearing.  Although Batyreva contends that the doctrine of collateral estoppel does not apply to the hearing and Article 75 proceeding because the Arbitrator did not decide on her claims of discrimination and retaliation (<u>id.</u> at 15), her analysis is incorrect.  To begin, the Arbitrator did consider Batyreva's claims of discrimination and retaliation, which she appears to concede at one point.  (<u>Id.</u> at 15.)  That is, in deciding that the negative evaluations were fair and reasonable, the Arbitrator must have determined that they were not animated by a discriminatory or retaliatory intent.  She cannot, therefore, relitigate in this Court the issues of whether she should have had the choice of a three-member panel or been permitted to introduce her student's test scores.

Batyreva also alleges that there are many disputed facts concerning the alleged Regents Examination violations by her supervisors. (Obj. at 3–7, 12–13.) As indicated by Magistrate Judge Freeman's analysis, whether any violations actually occurred is not pertinent to Batyreva's First Amendment claim.

The only reviewable issue that Batyreva raises in her objections is that Superintendent Gorman's letter was motivated by retaliation. (Id. at 18.) The Court agrees with Magistrate Judge Freeman's finding that there is no evidence of retaliation, particularly in light of the lack of temporal proximity and Batyreva's failure to contest any of the facts contained in this letter. (R&R, Aug. 23, 2010, at 50.) Since Batyreva has failed to produce any evidence that the letter would not have been written except in retaliation, or of any disputed material facts at all, the motion for summary judgment is granted.

## CONCLUSION

Defendant's motion for summary judgment is GRANTED. The Clerk of Court is directed to enter judgment accordingly and terminate the case.

Dated:      October 1, 2010
            New York, New York

SO ORDERED

PAUL A. CROTTY
United States District Judge

Copies Mailed To:

Olga Batyreva
2007 Surf Avenue #15D
Brooklyn, NY 11229

Ivan A. Mendez, Jr.
NYC Law Department, Office of the Corporation Counsel
100 Church Street
New York, NY 10007